**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **WHOA NETWORKS, INC., a Florida Corp.** | **Case No. 20- 21883-BKC-SMG** |
| **WHOA NETWORKS, INC., a Delaware Corp.** | **Case No. 20- 21884-BKC-SMG** |
| **HIPSKIND TECHNOLOGY SOLUTIONS** | **Case No. 20- 21885-BKC-SMG** |
| **  GROUP, INCORPORATED,** | |
| **PLATINUM SYSTEMS HOLDINGS, LLC,** | **Case No. 20-21886-BKC-SMG** |
| **Debtors.** | **(Jointly Administered Under** |
| _____/ | **Case No.20-21883-BKC-SMG)** |

**DECLARATION OF MARK AMARANT IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I,  Mark Amarant, submit this declaration (the "Declaration") pursuant to 28 U.S.C. § 1746 in support of the Chapter 11 petitions filed by the above referenced Debtors and the "first day" motions (the "First Day Motions") filed in connection therewith, and state as follows:

1.        I am the founder and Chief Executive Officer ("CEO") of "Whoa Networks" group of companies, which is comprised of: Whoa Networks, Inc., a Delaware corporation ("Whoa Delaware"), Whoa Networks, Inc., a Florida corporation ("Whoa Florida"), Hipskind Technology Solutions Group, Inc., an Illinois corporation ("Hipskind") and Platinum Systems Holdings, LLC, a Delaware limited liability company ("Platinum") (collectively, the "Debtors" or "Company").

2.        In connection with my role as CEO of the Debtors, I manage the day-to-day operations of the Company and make high-level decisions about policy and strategy.  As part of my functions, I also oversee the Company's fiscal activity, including budgeting, reporting, and auditing, and work with others in the Company to plan for short and long term goals.

3.        I submit this Declaration in support of the Debtors (a) voluntary petitions for relief

filed under chapter 11 of the Bankruptcy Code; and (b) the First Day Motions, which are being filed concurrently herewith.  I am knowledgeable about, and familiar with, the business and financial affairs of the Debtors.

4.    Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the Debtors business operations, my review of relevant business records of the Debtors, and other information provided to me or verified by other executives or employees of the Debtors under my direction and control.  Unless otherwise indicated, the financial information contained in this Declaration is unaudited and, due to the exigent circumstances facing the Debtors and the urgent need to file these Chapter 11 Cases, certain of the information contained herein is subject to change.  Notwithstanding, I am not aware of any information contained herein that is inaccurate.

5.    I am authorized to submit this Declaration on behalf of the Debtors, and if called upon to testify, I would testify that the facts set forth herein are true and correct.

6.    I have been in the information technology business for over 30 years.    In my business career, I have also been involved in all aspects of communications, having founded, operated, and sold several successful companies in the communications industry for over 30 years.

7.    From 1994 to 2011, I was the founder and served as CEO of STS Telecom ("STS Telecom"), a Florida based Voice over IP ("VOIP") company with 80 employees.  At STS Telecom, I developed innovations in customer service, billing, credit, collections, sales, and marketing. STS Telecom operated under licenses from the Federal Communications Commission and the Florida Public Service Commission. While at STS Telecom, I was able to substantially increase revenue in its core "cloud infrastructure" business segment by leveraging relationships with Value Added Resellers ("VAR") who successfully sold STS Telecom's services to

2

commercial businesses. For over a decade as CEO, I paid out approximately $4,000,000.00 per year in on-time commission payments and sales bonuses to STS Telecom's VAR partners.  In 2011, STS Telecom was named to the "Top 50 agent programs of 2011" by Phone + magazine. By 2011, STS Telecom had become one of the largest "Interconnect" companies in Florida.  In March of 2011, I sold STS Telecom to EarthLink (Nasdaq: ELNK).

8.      On October 29, 2020 (the "Petition Date"), the Debtors commenced the above referenced cases (the "Chapter 11 Cases") by filing voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court.  The Debtors intend to operate their business and manage their assets as a debtors-in-possession under the Bankruptcy Code.

9.      To minimize any adverse effects on their business as a result of the commencement of these Chapter 11 cases, the Debtors intend to request various types of relief in the First Day Motions described below. Through the First Day Motions, the Debtors seek authority from the Court to allow the Debtors to meet their necessary obligations and fulfill their duties as a debtors-in-possession.

10.     I am familiar with the contents of each of the First Day Motions and, to the best of my knowledge after reasonable inquiry, believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to enter and transition smoothly into chapter 11 with minimal disruption; (b) is critical to the Debtors' efforts to preserve value and maximize creditor and stakeholder recoveries; and (c) best serves the Debtors' estates and the interest of their creditors and stakeholders. Further, it is my belief that the relief sought in the First Day Motions is narrowly tailored and necessary to achieve the goals of these Chapter 11 Cases.

**Preliminary Statement**

11.     To familiarize the Court with the Debtors and the relief sought in the First Day

Motions filed in these Chapter 11 Cases, this Declaration is organized into four (4) parts as follows: (i) Part I describes the history, business and affairs of the Debtors, its corporate structure and business operations; (ii) Part II provides an overview of the Debtors' capital structure and major leases; (iii) Part III provides a description of the circumstances leading to the commencement of these Chapter 11 Cases; and (iv) Part IV provides an overview of the relief requested in the First Day Motions and sets forth the relevant facts in connection therewith.

**PART I**

**I.**     **OVERVIEW OF THE DEBTORS' HISTORY AND BUSINESS OPERATIONS**

    **A.**     **The Corporate History and Corporate Structure of the Debtors**

12.     The management team and information technology ("IT") professionals at the "Whoa Networks" group of companies have over 25 years of managed information technology experience. Whoa Florida was founded in 2013 with its principal place of business at 7261 Sheridan St, Hollywood, FL 33024. Whoa Delaware is the parent company that owns 100% of the equity interests in each of Whoa Florida and Hipskind. The majority of the equity in Whoa Delaware is owned by wife, Leslie Amarant, and me, with friends and family having a minority stake.

13.     Platinum was formed as a Delaware limited liability company on March 16, 2018 for the purpose of acquiring the assets of Platinum Systems, Inc. ("PSI"), a managed services provider ("MSP") headquartered in Kenosha, Wisconsin. After the closing of the acquisition transaction, on or about April 1, 2018, Whoa Florida owned seventy (70%) percent of the equity of Platinum, with the other thirty (30%) percent being owned by PSI. PSI is owned and controlled by Mr. Matthew Carlson.

14.     On or about April 25, 2018, Whoa Delaware acquired Hipskind, which is a Chicago

4

based IT solutions provider with operations in the Midwest.  Hipskind was a Value Added Reseller and focused mainly on hardware resale and had a handful of cloud clients.

**B.**    **The Debtors' Business Operations**

15.    Since its inception, Whoa Florida has built its business based on technologies from the leading providers in the industry, including NetApp, VMware, Citrix, Cisco, and Microsoft, plus top tier datacenters, Equinix Nap of the Americas in Miami FL, and Supernap in Grand Rapids, MI.  Today, the Debtors provide "end to end" IT solutions to its clients, including security and compliance, cloud, IT managed services and multi-vendor hardware purchases and support services.

16.    In providing its services, the Company utilizes "WHOA.com," which is a Cyber Secure Cloud Platform.™  WHOA.com is a multi-layered approach to security that provides clients with unprecedented threat protection to ensure the compliance of the entire cloud footprint. The Company's Cyber Secure Cloud Platform™ combines an enterprise-grade architecture featuring multiple Tier IV data centers and a security configuration with predictive analytics, intrusion detection and intrusion prevention. The Company's vision is to enhance clients' strategic and business operational capabilities by providing mission-critical secure cloud infrastructure for businesses, capable of protecting sensitive data and brand reputations of corporate enterprises. The infrastructure of WHOA.com is built for security, compliance, performance, service, and cost efficiency.

17.    Platinum provides managed services on-site and remote IT support to its customer base. Platinum also provides managed services for cloud and cloud backup, which compliment WHOA's current portfolio of secure cloud computing services.

18.    In addition, the Debtors provide the following broad range of services to its clients:

5

a.      **IT Services –** The Debtors' Secured Public Cloud Infrastructure ("SPC") is deployed in a highly secure, best-in-class, multi-tenant infrastructure that provides clients their own private, self-contained virtual data centers. Each of these environments provide operating systems, applications, and additional services to meet customer needs. The WHOA.com Cyber Secure Cloud Platform™ is the only cloud that combines an enterprise-grade architecture featuring multiple Tier IV data centers and perimeter security along with enterprise-grade intrusion detection and intrusion prevention services.  WHOA.com's secure cloud infrastructure features an ISO 27001 certification[1] and is HIPAA compliant for their healthcare clients.  Additionally, all data centers are SSAE 16-certified Tier IV facilities, and adhere to the Data Protection Act of 1998, which is foundational for HIPAA compliance.

b.      **Managed OS Service** - This service helps provide an extension to a client's IT department to manage its Operating Systems with the installation, administration, maintenance, monitoring, and optional special services for managing Operating Systems.  This service is for Cloud Servers running Windows and RHEL OS's from our WHOA Catalog. This managed service provides supplemental support to assist with various OS issues that could possibly occur. Although this service does not include management related to Applications, the Debtors' Cloud Engineers work with clients to help resolve application related issues on a best efforts basis to keep their Cloud Solutions running. The Debtors also implement best practices for OS optimization for workloads such as SQL or Exchange, to ensure that customer's applications will have minimal issues and optimum performance.

c.      **Managed Monitoring** – The Debtors provide their clients with a "Logic

---

[1] An ISO 27001 Certification is a certification provided by an independent expert which confirms that the Debtors have invested in the people, process and technology necessary to protect the data that they maintain for their clients.

Monitoring Managed Service," which is a supplemental proactive monitoring service for public, private, and hybrid solutions that will serve as additional support to a customer's IT team to monitor and resolve all of such customer's critical alerts 24x7x365.   The Debtors' network operating center will carefully monitor all critical components in the clients' environment, as well as designing a custom escalation strategy should issues arise.   Clients are able to subscribe to this service at a per "virtual machine" ("VM") level, providing flexibility and cost efficiency for critical servers that require this level of high touch service.

        d.     **Managed SQL Database Services** – The Debtors' managed services deliver value across all aspects of the data tier. The Debtors provide clients with professionals with years of experience architecting, deploying and managing enterprise SQL Server deployments taking advantage of many years of experience with some of the largest transactional systems in the world. These professionals have worked extensively in the finance, insurance, healthcare, manufacturing, and public service arenas with organizations large and small. Data, processing, and technical expertise at the application, network, and infrastructure levels, are essential for getting the most out of a customer's critical data platform.  The Debtors' combined teams of experts wield the tools and expertise necessary to ensure a healthy data ecosystem.

        e.     **Managed Backup** – The Debtors offer a fully managed backup service to protect their customer's Cloud Servers against loss of data in the event of a hard drive failure, system crashes, user deletion errors, accidents, or even a disaster.  The Debtors offer backup services on an enterprise platform that handles this essential task on a regular basis to prevent critical data loss. The Debtors' Cloud Engineers take on the responsibility of implementing and configuring the backup service, providing 24 X 7 X 365 management and monitoring of all backups, making sure that the customer has enough space to save all of its critical backup data.

      f.      **Managed Replication** – The Debtors offer a fully Managed Replication Service to meet critical backup and disaster recovery strategy.  This eliminates the complexity and cost of organizations having to build out fully redundant systems in order to have business continuity or a disaster recovery plan.  With the Managed Replication Service, a customer's Cloud Servers and all associated data and applications are replicated to another predetermined WHOA.com Data Center of their choice.  The Cloud Server's data, websites, and applications are backed up every night during the backup window.  Once completed, the replication process starts at a geographically distant WHOA datacenter selected by the customer.  This allows the Debtors to secure backups to another datacenter in the event of any disaster, whether it is natural or not.

      g.      **Networking** – The Debtors' Cloud "Domain Name System" service utilizes a highly scalable multi-datacenter, multi-country cloud platform and provides web-based, self-service access to highly-available cloud DNS features and functionality. The DNS cloud infrastructure is built using Anycast architecture and high end infrastructure, which provides security and scalability; and

      h.      **Office 365** – With Microsoft Office 365, the Debtors' clients can meet all of their productivity needs with one, integrated cloud-based solution that is always up to date. Office 365 gives clients the most use across all devices plus 1TB file storage per user, unlimited online meetings, business-class email and team intranet sites. All applications and services work seamlessly together giving users a consistent experience no matter where they are. Clients can manage all applications, services and devices from a single portal and Office 365 has built-in, enterprise-grade security and privacy. Microsoft Office 365 delivers the power of cloud productivity to businesses of all sizes, helping save time, money, and free up valued resources. Office 365 combines the familiar Microsoft Office desktop suite with cloud-based versions of

Microsoft's next-generation communications and collaboration services—including Microsoft Exchange Online, Microsoft SharePoint Online, Office Online, and Microsoft Skype for Business Online—to help users be productive from virtually anywhere through the Internet.

### C.    The Debtors' Management Team.

19.    In addition to myself, the Debtors' senior management team includes:

**a.    Mike Leonard, Chief Information Security Officer** – The Chief Information Security Officer ("CISO") serves as the process owner of all assurance activities related to the availability, integrity and confidentiality of customer, business partner, employee and business information in compliance with the organization's information security policies.  A key element of the CISO's role is working with executive management to determine acceptable levels of risk for the organization. Mr. Leonard is responsible for establishing and maintaining a corporate-wide information security management program to ensure that information assets are adequately protected.

Prior to joining Whoa, Mr. Leonard was IT Director of Infrastructure and CISO for a financial services company in Boca Raton, Florida where he was responsible for ensuring the security, availability, and scalability of the entire platform of data and telecommunication systems the IT team provides. He was also responsible for the teams that administer all servers, SQL databases, networks, security, policies and procedures. He has extensive experience with iSeries, Linux, SQL, VMware, Hyper-V, Windows administration, firewalls, cloud infrastructure, telephony, and managing vendors and support teams.

Mr. Leonard has a Master of Business Administration (MBA) degree and Doctor of Jurisprudence (JD) degree.  He has nearly twenty-five (25) years of experience with IT operations, infrastructure, support and networking in distributed environments.

**b.    Richard Gettino, Director of Operations for Whoa Networks**- Mr. Gettino is a and has been with the Company in multiple roles since 2013. Mr. Gettino oversees the Company's Florida operations (Whoa Networks and Hipskind). He has served in the positions of Controller and Senior Project Manager.  His duties and responsibilities include, but are not limited to, Accounts Payable, Accounts Receivable, collections, commissions, vendor contract management, hardware/software procurement, payment platform administration/bank deposits, site/building management, data center upgrades/decommissions,  multi-location security network (offices and employees), marketing and weekly management meetings.

**c.    Daniel Carlson, Vice President of Platinum**- Mr. Carlson is Vice President of Platinum and has been employed with Platinum since its inception 20 years ago. Mr. Carlson is

responsible for managing all of Platinum, and reports directly to me as the CEO. Mr. Carlson oversees the Company's Midwest operations, which include customer service, billing, sales, marketing, network operations, collections, and accounting.

### D.  **Employees**

20.    Collectively as of the Petition Date, the Debtors 32 employees who are critical to the business operations.  Whoa Networks, Inc. (Florida) ("Whoa FL") and Platinum Systems Holdings, LLC ("Platinum") are the only two Debtors with Employees.  Whoa FL has 3 employees, comprising of the Debtors' senior management and Platinum has 29 employees.  Whoa FL utilizes Trinet and Platinum utilizes Paylocity to process their respective payrolls, employee deductions and payroll tax obligations

### PART II

### THE DEBTORS' CAPITAL STRUCTURE

### A.    Assets, Liabilities and Revenues

21.    As of September 30, 2020, the Debtors, Whoa Delaware, Whoa Florida and Hipskind, had assets and liabilities of $7.4 million and $18.6 million, respectively.  For the year ended December 31, 2019, the Debtors, Whoa Delaware, Whoa Florida and Hipskind, had operating revenues of $3.5 million, and operating expenses of $4.8 million.  As of September 30, 2020, the Debtor, Platinum, had assets and liabilities of $746,000 and $815,000, respectively.  For the year ended December 31, 2019, the Platinum had operating revenues of $4.9 million, and operating expenses of $ 4.7 million.

### B.    Loans with Radius Bank and Johnson Bank

22.    Radius Bank - Prior to the Petition Date, Whoa Delaware, Whoa Florida and Hipskind (the "Radius Bank Debtors") obtained a Small Business Administration loan in the amount of $5,000,000 from Radius Bank (the "Loan") pursuant to the terms of (i) that certain

Loan Agreement, dated January 29, 2018, by and among Radius Bank and the Radius Bank Debtors (the "Loan Agreement"), (ii) that certain U.S. Small Business Administration (the "SBA") Promissory Note, dated January 29, 2018 (the "Note") payable from the Radius Bank Debtors to Radius Bank in the original principal amount of $5,000,000.00, (iii) those three certain Security Agreements, one with each Radius Bank Debtor, granting a lien on substantially all of the assets of the Radius Bank Debtors in favor of Radius Bank (collectively, the "Security Agreements"), (iv) UCC-1 financing statements filed in Delaware and Florida (the "UCC-1s"), (v) certain Stock Pledge Agreements, dated January 29, 2018 (the "Stock Pledges"), and (vi) certain related loan and security agreements (collectively, the "Loan Documents").

23.     Pursuant to the Loan Documents, Radius Bank asserts a first perfected lien and security interest in all or substantially all of the assets of the Radius Bank Debtors, including all accounts, inventory, equipment, furniture, fixtures, other tangible property, general intangibles, chattel paper and any cash or cash equivalents, funds or proceeds of or derived from any of the foregoing collateral (the "Radius Bank Collateral"), securing the obligations of the Radius Bank Debtors under the Loan Documents.  I am informed that any cash or cash equivalents derived from the Radius Bank Collateral may constitute cash collateral within the meaning of Section 363 of the Bankruptcy Code (the "Cash Collateral").

24.     My wife, Leslie Amarant, and I, along with Whoa Media Holdings Corp. guaranteed the Loan by and through those certain Unconditional Unlimited Guarantees (the "Guarantees").  The Guarantees of my wife and I are secured by a certain Mortgage, dated January 29, 2018, encumbering our homestead in the maximum amount of $400,000.

25.     As of the Petition Date, the approximate outstanding balance of the Loan was $4,134,067.00.  During a period of six (6) months beginning and after March 2020, the monthly

payments due under the Loan were made by the Administrator under the CARES ACT.

26.    In addition to the foregoing, Whoa Florida applied and received funds in the amount of $98,835 under the federal Paycheck Protection Program administered by the SBA through Radius Bank (the "PPP Loan").  Whoa Florida has applied for the forgiveness of the PPP Loan as the monies advanced under the PPP Loan were used for the purposes stipulated in the CARES ACT.

27.    Johnson Bank - Prior to the Petition Date, Platinum obtained a loan in the original principal amount of $500,000.00 from Johnson Bank (the "Johnson Bank Loan") pursuant to the terms of (i) that certain Business Loan Agreement (the "Loan Agreement"); (ii) that certain Promissory Note, dated April 18, 2020, payable from Platinum to Johnson Bank in the original principal amount of $500,000.00 (the "Johnson Bank Note"), (iii) that certain Commercial Security Agreement, dated April 18, 2018, granting a lien on substantially all of the assets of Platinum in favor of Johnson Bank (the "Security Agreement"), (iv) UCC-1 financing statements filed in Delaware and Wisconsin (the "UCC-1s"), and (v) certain related loan and security agreements (collectively, the "Loan Documents").   The Note matured on July 17, 2020 ("Maturity Date").

28.    I also guaranteed the Johnson Bank Loan by and through that certain Unconditional Unlimited Guarantee (the "Guaranty").  On or about August 4, 2020, Platinum, Johnson Bank and I, as the guarantor, entered into a Forbearance Agreement which among other things extended the Maturity Date to the earliest of (a) October 17, 2020 or (b) the occurrence of any Event of Default under the Forbearance Agreement. The balance under the Johnson Bank Note with accrued interest as of October 19, 2020 was $314,933.02.

29.    In addition to the foregoing,  Platinum is also indebted to Johnson Bank under a

Paycheck Protection Program administered by the SBA in the principal amount of $456,900 through Johnson Bank (the "Platinum PPP Loan"). In connection with the Platinum PPP Loan, Platinum has applied for, and believes that it has qualified for, the forgiveness of the PPP Loan as the monies advanced were used for the purposes stipulated in the CARES ACT.

### C.    Equipment Used in Operation of the Business

30.    The Company uses enterprise-grade computing equipment, located in Tier IV datacenters, for storage, security, server virtualization, networking and backups. In the datacenters, the Company has Palo Alto firewalls for security and traffic control. The Company utilizes network switches and routers from Cisco and Juniper to connect and route all data. The Company relies on Tintri storage arrays for all production data storage needs, which are connected to Cisco UCS servers for hosting our VMWare virtualization platform. The Company's data, as well as our clients' data, is backed up using Cohesity hardware located in both the datacenters and on customer premises. In its corporate office, the Company relies on Cisco Meraki wireless equipment, and its workforce is equipped with laptops. In connection with the foregoing equipment, the Debtors are party to a number of financing agreements, which the Debtors assert are security agreements as opposed to "true" leases.

### D.    Corporate Headquarter Leases

31.    The Debtor, Whoa Florida, is a party to a commercial lease, dated February 24, 2020, with Marx Developments LLC (the "Landlord") (the "Whoa Lease") for the corporate headquarters located at 7261 Sheridan Street, Suite 340, Hollywood, Florida 33024. The Whoa Lease is for a period of sixty (60) months with a base rent of $7,500 per month plus sales tax and proportionate share of common area maintenance costs. Whoa Florida has an option to extend the Lease for one (1) five year renewal term.

13

32.    Additionally, Platinum is a party to a commercial lease dated October 20, 2019, with ROA, LLC (the "Platinum Landlord")(the "Platinum Lease") for offices located at 4600 Green Bay Rd, Kenosha, WI.  The Platinum Lease is for a period of 24 months expiring on October 31, 2021 ("Initial Term") with a base rent of $5,900 per month.  Platinum has the option to extend the Lease until October 31, 2024.

**E.    Unsecured Liabilities**

33.    As of the Petition Date, the total estimated amount of unsecured debt (excluding deficiency claims of undersecured creditors) for the Debtors are as follows: Whoa DE – None; Whoa FL $322,000; Hipskind $0; and Platinum $327k.  The Debtors anticipate that there will be a material amount of unsecured deficiency claims.

**PART III**

**EVENTS LEADING UP TO THE CHAPTER 11 CASES**

34.    As set forth above, Whoa Florida was founded in 2013, with a mission to become a Cyber Secure Cloud Provider.  After a four (4) year extensive multi-region cloud buildout and certification process, Whoa Florida embarked on an acquisition plan in 2017 with the goal to be a single solution provider for medium sized businesses in the Southeast and Midwest, and to achieve $20 mm in revenues with 20% EBITDA in 2020.  The first acquisition took place in 2017 with the purchase of Hipskind based in Chicago.  Also as set forth above, in April 2018, the Company acquired Platinum, a managed services provider based in Kenosha, WI.

35.    In early 2020, the Company entered into two letters of intent (the "LOIs"), in each case to acquire companies based in in Fort Myers, Florida, that would enable the Debtors to substantial increase their revenues.  However, due to the onset of the COVID-19 pandemic, the Debtors were unable to obtaining the necessary financing to consummate such transactions, and

14

as such they fell through.

36.     As a result of their inability to consummate such acquisitions and the continued impact of the COVID-19 pandemic, the Debtors engaged in a thoughtful evaluation of all available options.  Ultimately, the Debtors made the decision to restructure their liabilities by commencing these Chapter 11 Cases.  As described in greater detail below, the Debtors operate in a highly competitive and fragmented industry that is characterized by rapid innovation, price sensitivity and consolidation. Many of the Debtors' competitors for data center infrastructure, cloud and connectivity services have substantially greater financial resources and have the ability to adopt more aggressive pricing policies and devote greater resources to the promotion, marketing and sales of their services. Pricing for the types of services that the Debtors provide has declined in recent years, which has negatively impacted the Debtors' business.  Additionally, the Debtors have a substantial amount of debt on their balance sheet which includes loans to banks, leases and/or secured financing agreements that require restructuring.   These issues were aggravated by the failed acquisition and the onset of the COVID-19 pandemic earlier this year which negatively affected the managed service revenues causing a sharp decline since March 2020.  The Debtors expect to emerge from chapter 11 quickly, financially stronger and well positioned to deliver their comprehensive portfolio of premium data center infrastructure, best-in-class cloud solutions and high-performance network services well into the future.

## PART IV

## OVERVIEW OF FIRST DAY MOTIONS AND APPLICATIONS

37.     Contemporaneously with the filing of this Declaration, the Debtors have filed or expect to file a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business, facilitate the efficient administration of these Chapter

11 cases, lessen the impact of the Chapter 11 cases on the Debtors' day-to-day operations and employees, and facilitate a successful reorganization of the Debtors.  I have reviewed each of the First Day Motions (including the exhibits thereto) and confirm that the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  I believe that this Court's approval of the relief requested in the First Day Motions is essential to avoid immediate and irreparable harm to the Debtors and their bankruptcy estates, to provide the Debtors with an opportunity to continue to meet their post-petition obligations in the ordinary course of business, to provide for a smooth transition into chapter 11 and to provide for the efficient and swift administration of these Chapter 11 Cases.   As a result, the Debtors respectfully request that the Court conduct a hearing on November 4, 2020 (the "First Day Hearing") to consider the First Day Motions.  A description of the relief requested in, and the facts supporting, each of the First Day Motions is briefly set forth below: [2]

A.     **Debtors Expedited Application for Approval, on an Interim and Final Basis, of the Employment of Paul J. Battista and the Law Firm of Genovese, Joblove & Battista, P.A. as Counsel for Debtors-in-Possession (the "GJB Application")**

38.     The Debtors seek authority to retain, on an interim basis and final basis, Paul J. Battista and the law firm of Genovese Joblove & Battista, P.A. ("GJB") as its general bankruptcy counsel. As detailed in the GJB Application, the Debtors understand that Mr. Battista and GJB have extensive experience representing chapter 11 debtors in this district (and other districts in Florida and across the country) and that they are well qualified to serve as general bankruptcy counsel to the Debtor. The Debtors believe that it is in its best interest, and those of its stakeholders, that Mr. Battista and GJB be retained to serve as Debtors' general bankruptcy

---

[2] Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motion described herein.

counsel in these Chapter 11 Cases.

39.     To the best of the Debtors' knowledge, except as disclosed in the Declaration of Paul J. Battista on behalf of GJB attached to the GJB Application, neither Mr. Battista nor GJB has any connection with the Debtors, their creditors or other parties in interest in these Chapter 11 Cases.  I understand that corporations like the Debtors may not appear in a Florida or federal court *pro se*, and that only a licensed attorney may appear on their behalf.  Because there is a various relief that must be sought from the Court immediately, the Debtors will suffer immediate and irreparable harm if it is unable to obtain the services of counsel before a final hearing on the application for approval of counsel's employment can be convened.  It is, therefore, my belief that only with the granting of interim approval of the employment of Mr. Battista and GJB will such immediate and irreparable injury be avoided. Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtors, the bankruptcy estates and the creditors for the Debtors to retain GJB as the Debtors' general bankruptcy counsel.

**B.      Debtors' Emergency Motion For Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral of Radius Bank, (II) Providing Adequate Protection in connection therewith, and (III) Setting Interim and Final Hearings  (the "<u>Radius Bank Cash Collateral Motion</u>").**

40.     The Radius Bank Debtors seek authorization to use the Cash Collateral of Radius Bank on an emergency interim basis in accordance with the Budget attached to the Radius Bank Cash Collateral Motion for the next 30 days pursuant to the terms of the proposed Interim Order attached thereto.

41.     In connection with the proposed use of Radius Bank's Cash Collateral and in order to provide Radius Bank with adequate protection for the aggregate diminution of its Cash Collateral resulting from the Radius Bank Debtors' use thereof, the Radius Bank Debtors have

agreed, subject to approval of this Court, that Radius Bank shall have and be granted, effective as of the Petition Date, a replacement lien pursuant to 11 U.S.C. §361(2) on and in all assets of the Radius Bank Debtors that are acquired or generated after the Petition Date, but solely to the same extent and priority, and of the same kind and nature, as the Radius Bank Collateral securing the pre-petition obligations to Radius Bank under its Loan Documents.

42.     I have been informed and understand that the replacement liens proposed to be granted to Radius Bank shall not create a lien on or against any claims or causes of action of the Radius Bank Debtors arising under Sections 542 through 550 of the Bankruptcy Code (the "Avoidance Actions") or on or against the proceeds of the Avoidance Actions.

43.     The Radius Bank Debtors also agree to provide Radius Bank with any and all financial and other reporting required under its Loan Documents or any other financial and other reporting or information reasonably requested by Radius Bank.

44.     The Radius Bank Debtors propose to use the Cash Collateral strictly in accordance with the terms of that certain Budget attached to the Motion.  However, the Radius Bank Debtors request that they be allowed a variance in respect of any line item(s) set forth in the Budget to enable the Radius Bank Debtors to make payments in excess of any such line item(s) during a particular period in the Budget, provided that the such excess payments in the aggregate shall not exceed ten percent (10%) of the total budgeted expenses for the same period in the Budget (collectively, the "Allowed Variance").

45.     An immediate and critical need exists for the Radius Bank Debtors to be permitted access to Cash Collateral in order to continue to operate their businesses and preserve their ongoing, enterprise value. If the Radius Bank Debtors are not allowed to use Cash Collateral, their business operations will be substantially interrupted. This would result in a significant

diminution in the value of their assets (including the Cash Collateral) to the detriment of their creditors, employees and interest holders, as well as other harm to the respective bankruptcy estates. The proposed use of Cash Collateral, therefore, is essential to sustain the Radius Bank Debtors during these Chapter 11 Cases and to prevent irreparable harm to their estates.

46.    Given the circumstances of these Chapter 11 Cases, I believe that the terms of the use of Cash Collateral proposed in the Motion are fair, reasonable and adequate, and in the best interest of the Debtors' estates. The use of Cash Collateral provides the Radius Bank Debtors with working capital pursuant to the Budget, pending final approval of the use of Cash Collateral on a permanent basis at the Final Hearing. The Radius Bank Debtors and I submit that granting of the relief sought is necessary and appropriate and in the best interests of the Radius Bank Debtors, their creditors, employees, clients, shareholders and all parties in interest.

**C.    Debtors' Emergency Motion For Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral of Johnson Bank, (II) Providing Adequate Protection in connection therewith, and (III) Setting Interim and Final Hearings  (the "<u>Johnson Bank Cash Collateral Motion</u>").**

47.    Platinum seeks authorization to use the Cash Collateral of Johnson Bank on an emergency interim basis in accordance with the Budget attached to the Johnson Bank Cash Collateral Motion for the next 30 days pursuant to the terms of the proposed Interim Order attached thereto.

48.    In connection with the proposed use of Johnson Bank's Cash Collateral and in order to provide Johnson Bank with adequate protection for the aggregate diminution of the cash collateral resulting from Platinum's use thereof, Platinum has agreed, subject to approval of this Court, that Johnson Bank shall have and be granted, effective as of the Petition Date,  a replacement lien pursuant to 11 U.S.C. §361(2) on and in all assets of Platinum that are

acquired or generated after the Petition Date, but solely to the same extent and priority, and of the same kind and nature, as the Johnson Bank Collateral securing the pre-petition obligations to Johnson Bank under its Loan Documents.

49.     I have been informed and understand that the replacement liens proposed to be granted to Johnson Bank shall not create a lien on or against any Avoidance Actions of Platinum arising under Sections 542 through 550 of the Bankruptcy Code or on or against the proceeds of the Avoidance Actions.

50.     Platinum also agrees to provide Johnson Bank with any and all financial and other reporting required under its Loan Documents or any other financial and other reporting or information reasonably requested by Johnson Bank.

51.     Platinum proposes to use the Cash Collateral strictly in accordance with the terms of that certain Budget attached to the Johnson Bank Cash Collateral Motion.  However, Platinum requests that it be allowed a variance in respect of any line item(s) set forth in the Budget to enable Platinum to make payments in excess of any such line item(s) during a particular period in the Budget, provided that the such excess payments in the aggregate shall not exceed the Allowed Variance.

52.     An immediate and critical need exists for Platinum to be permitted access to Cash Collateral in order to continue to operate its business and preserve its ongoing, enterprise value. If Platinum is not allowed to use Cash Collateral, its business operations will be substantially interrupted. This would result in a significant diminution in the value of its assets (including the Cash Collateral) to the detriment of its creditors, employees and interest holders, as well as other harm to its bankruptcy estate. The proposed use of Cash Collateral, therefore, is essential to sustain Platinum during these Chapter 11 Cases and to prevent irreparable harm to its estate.

53. Given the circumstances of these Chapter 11 Cases, I believe that the terms of the use of Cash Collateral proposed in the Johnson Bank Cash Collateral Motion are fair, reasonable and adequate, and in the best interest of Platinum's estate. The use of Cash Collateral provides Platinum with working capital pursuant to the Budget, pending final approval of the use of Cash Collateral on a permanent basis at the Final Hearing. Platinum and I submit that granting of the relief sought is necessary and appropriate and in the best interests of Platinum, its creditors, employees, clients, shareholders and all parties in interest.

**D.     Debtors' Emergency Motion for the Entry of an Order (I) Authorizing the Payment of Pre-petition Wages, Salaries, and Employees Benefits, (II) Authorizing the Debtors to Continue the Maintenance of Employee Practices and Benefit Plans and Programs in the Ordinary Course and (III) Directing all Banks to Honor Pre-petition Checks for Payment of Pre-petition Employee Obligations (the "Payroll Motion")**

54. Pursuant to the Payroll Motion, the Debtors seek entry of an order pursuant to sections 105(a) and 507(a)(3) and (4) of the Bankruptcy Code authorizing the Debtors to (a) pay the various pre-petition wages, salaries, and employee benefits of the Debtors' employees (collectively, the "Employees"), and (b) continue the Debtors' various pre-petition Employee practices, benefit plans and programs provided by the Debtors in the ordinary course, as described below (collectively, the "Pre-petition Employee Obligations").  In connection therewith, the Debtors also seek authorization to pay all federal and state withholding and payroll-related taxes relating to pre-petition periods including, but not limited to, all withholding taxes, Social Security taxes, and Medicare taxes, as well as all other withholdings and employee deductions, if any. Finally, the Debtors request that the order also granting the Payroll Motion (a) direct all banks to honor the Debtors' pre-petition checks for payment for Pre-petition Employee Obligations, and (b) prohibit banks from placing any hold on, or attempting to reverse, any automatic transfers to Employees' accounts relating to Pre-petition Employee Obligations.

21

55.     As of the Petition Date, Whoa and Hipskind employs 3 full time Employees. Platinum employs approximately 29 full and part time Employees, and office staff.

56.     The estimated amount of the Debtors pre-petition payroll for all Employees is approximately $76,000.  No single Employee's pre-petition compensation exceeds the $13,650 priority wage limit set forth in Section 507(a)(4) of the Bankruptcy Code.

57.     In addition to the above, the Debtors have established various employee benefit plans and policies in the ordinary course of business for the benefit of its Employees which include medical, dental and vision insurance, disability insurance, vacation pay, personal time off, 401k  and other similar such benefits (collectively, the "Employee Benefits").  As set forth in the Payroll Motion, the Debtors propose to continue the Employee Benefits uninterrupted into these Chapter 11 Cases for their Employees.

58.     The Debtors do not seek to alter their compensation, vacation, or other benefit programs or policies.  Rather, pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, the Debtors seek authority to honor and pay the Prepetition Employee Obligations as and when they come due in the ordinary course of business in accordance with the Payroll Motion, and to continue at this time its practices, programs, and policies for its Employees, as those practices, programs, and policies were in effect as of the Petition Date.

59.     Further, the Debtors are not seeking authority to pay any individual Employee in an amount greater than the $13,650 priority cap imposed by section 507(a)(4) of the Bankruptcy Code.

**E.      Debtors' Emergency Motion For Entry Of Interim And Final  Orders (I) Authorizing Maintenance Of Certain Existing Bank Accounts And Cash Management System, (II) Waiving Certain U.S. Trustee Requirements In Connection Therewith, And (III) Granting Related Relief ("Cash Management Motion")**

60.     Pursuant to the Cash Management Motion, the Debtors seek entry of an order (i) authorizing the Debtors to maintain their existing Bank Accounts, as well as their Cash Management System, (ii) granting the Debtors a waiver of certain bank account and related requirements of the Office of the United States Trustee for the Southern District of Florida (the "U.S. Trustee") to the extent that such requirements are inconsistent with (a) the Debtors existing practices under its Cash Management System, including continue using Automated Clearing House (ACH) and wire transfers; and (b) authorizing the banks to continue to maintain, service and administer the Bank Accounts in the ordinary course of business.

61.     Additionally, the Cash Management Motion seeks authority of the Debtors to continue utilizing two (2) business credit cards (the "Credit Cards") routinely used to pay a number of their trade vendors that only accept credit card payments.

62.     The Credit Cards provide the Debtors at least a 30-day float before making payments when the credit card balance is due. The ability to use cash during that time improves the Debtors' liquidity for daily operations and cash management by allowing the Debtors to smooth out and normalize cash outflows. Additionally, the Credit Cards provide the added convenience to the Debtors of paying obligations by credit card rather than by wire or check. The Credit Cards are an integral part of the Debtors' Cash Management System and are utilized in the ordinary course of business.  To the best of my knowledge, there were no past due amounts as of the Petition Date owed in respect of the Credit Cards.

63.     Notwithstanding the relief requested in the Cash Management Motion, the Debtors will agree to comply with the Guidelines to the extent they require the opening of new debtor-in-possession payroll and tax accounts at a U.S. Trustee authorized depository; new set of books and records as of the commencement date of the case, use new business forms

23

indicating the debtor in possession status of the chapter 11 debtor, and provide consent to the U.S. Trustee to request copies of bank statements and/or supporting documentation directly from the Debtors Banks.

64.     The Debtors' Cash Management System is similar to the cash management systems used by other comparably sized iCloud companies to manage cash flow. The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds and to facilitate cash monitoring, forecasting, and reporting. The Debtors' Cash Management System facilitates the timely and efficient collection, management, and disbursement of funds. Because of the nature of the Debtors' business and the disruption that would result if the Debtors were forced to close their existing Bank Accounts, it is critical that the existing Cash Management System remain in place.

65.     By preserving business continuity and avoiding operational and administrative paralysis that closing the existing Bank Accounts and opening new ones would necessarily create, all parties-in-interest will be best served by maintaining the Bank Accounts and the benefits to the Debtors' estates will be considerable.

**F.     Debtors' Emergency Motion For Entry Of Interim And Final Orders (I) Authorizing, But Not Directing, The Debtors To Pay Prepetition Claims Of Critical Vendors, And (II) Granting Related Relief Thereto ("<u>Critical Vendor Motion</u>").**

66.     Through the course of their business, the Debtors have developed relationships with certain suppliers, service providers and partners (namely, the Critical Vendors) that supply certain services and/or licensing that are essential to the Debtors ability to continue to provide a broad range of services to their clients.  Such Critical Vendors would be difficult, and in most cases impossible, for the Debtors to replace.

67.     Pursuant to the Critical Vendor Motion, the Debtors seek entry of an Interim Order authorizing, but not directing, the Debtors to honor prepetition obligations owed to certain vendors, suppliers and service providers, including but not limited to Ingram Micro, Inc., Tech Data, TruSec and Pax8 (the "Critical Vendors" and the claims of such vendors "Critical Vendor Claims") upon certain terms and conditions more fully described in the Critical Vendor Motion.

68.     Additionally, the Debtors request that the Order (a) authorize all applicable banks and other financial institutions (collectively, the "Banks"), when requested by the Debtors, to receive, process, honor, and pay any and all checks, drafts, and other forms of payment, including fund transfers (collectively, the "Payments"), made in connection with the Critical Vendor Claims, whether such Payments were submitted before, on, or after the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such Payments and that any such Bank shall not have any liability to any party for relying on such direction by the Debtors; (b) authorize the Banks to rely on any directions and representations of the Debtors as to which Payments are subject to the Critical Vendor Motion, provided that any such Bank shall not have any liability to any party for relying on such directions or representations by the Debtors; (c) authorize, but not direct, the Debtors to issue new postpetition checks or effect new postpetition fund transfers or other new postpetition Payments to replace any checks, drafts, and other forms of payment, including fund transfers, which may be inadvertently dishonored or rejected; and (d) authorize, but not direct, the Debtors to continue in their ordinary course to make Payments on account of the Critical Vendor Claims.

69.     The services provided by the Critical Vendors will be ongoing and integral to the Debtors business operations; therefore, it would be entirely inefficient, uneconomical and

25

burdensome to the Debtors estates if a replacement provider had to be retained.    Such replacement would likely have to spend significant time and resources to "get up to speed" and cause interruption of the systems in place.

70.    The Debtors submit that the relief requested is appropriate, the decision to seek that relief well within the scope of its business judgment, and that the relief is in the best interests of all stakeholders in the Debtors chapter 11 cases.

71.    In order to facilitate payment to the Critical Vendors, the Debtors are seeking approval from the Banks that assert a claim on the Debtors Cash Collateral to include the additional costs of retaining these critical vendors in the Debtors Budget.

## **28 U.S.C. § 1746 Declaration**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 2nd day of November, 2020 in Miami, Florida.

*/s/ Mark Amarant*